Gordon GOULD et al., Plaintiffs,

v.

LUMONICS RESEARCH LIMITED,
Defendant,

and

General Motors Corporation,
Defendant-Intervenor.

No. 79 C 4594.

United States District Court,
N. D. Illinois, E. D.

Aug. 25, 1980.

---

9. *See Bumpus v. Gunter*, 452 F.Supp. 1060 at 1061 (D.Mass.1980), *appeal docketed*, C. 80– 1114 (1st Cir., Feb. 14, 1980).

Thomas G. Scavone, Hosier, Niro & Daleiden, Chicago, Ill., Joseph S. Littenberg, Lerner, David, Littenberg & Samuel, Westfield, N. J., for plaintiffs.

Jerome S. Littenberg, Westfield, N. J., Robert W. Duckworth, Duckworth, Hobby, Allen & Pettis, P. A., Orlando, Fla., D. Dennis Allegretti, Allegretti, Newitt, Witcoff & McAndrews, Chicago, Ill., for defendant.

Tim G. Jagodzinski, George E. Frost, Detroit, Mich., for General Motors Corporation.

## OPINION AND ORDER

SHADUR, District Judge.

Defendant Lumonics Research Limited ("Lumonics")[1] has moved:

1. to dismiss the complaint or alternatively require the joinder of Creative Patents, Inc. ("Creative Patents") as an indispensable party plaintiff; and

2. to disqualify the firm of Lerner, David, Littenberg & Samuel ("Lerner, David") as counsel for plaintiffs.

For the reasons stated in this opinion and order each of Lumonics' motions is denied.

### Facts

Creative Patents is a corporation whose shareholders are (1) the six partners in the Lerner, David law firm partnership sought to be disqualified by Lumonics' motion[2] and (2) plaintiff Patlex Corporation ("Patlex"). Until September 30, 1979 Creative Patents was a professional corporation (then named Lerner, David, Littenberg & Samuel, P.A.) engaged in the practice of law. On October 1, 1979 it began operations solely as a general business corporation, having not only an interest in the patent in suit in this case (a laser patent on an invention by plaintiff Gordon Gould) but also a 47½% interest in a company that is developing and marketing a new telephone dialer. Patlex acquired its stock interest in Creative Patents in November 1979 for over $1 million.

Creative Patents' interest in the patent in suit was acquired June 8, 1976 under a letter agreement ("the 1976 Agreement") with plaintiffs Gordon Gould ("Gould," the inventor) and Refac International, Limited ("Refac," the prior assignee of part of Gould's rights in the invention). Under the 1976 Agreement Creative Patents (which was then, as already stated, a professional corporation) agreed to:

"furnish legal services, including disbursements relating thereto, for the purpose of obtaining patents for Gould on pending applications and any applications filed in the future claiming the filing dates of presently pending patent applications, and for the purpose of enforcing such patents, including assisting in licensing, if requested to do so, up to a total amount of $300,000."

Gould and Refac agreed that (subject to reduction if Creative Patents terminated the agreement before the full $300,000 was expended):

"[Creative Patents] has a full and complete 25% interest in all gross income derived from such rights and patents. Gross income shall include the total compensation in any form received on account of said rights and patents undiluted by any distribution or encumbrances of others."

Under the 1976 Agreement Creative Patents is entitled to receive payments equal to 50% of all gross income until such payments have equaled the $300,000 expended by it, and 25% of gross income thereafter.

In addition the 1976 Agreement provided:

"It is understood and agreed that reasonableness will prevail in respect of when litigation should be commenced, when patent applications would be permitted to expire, licenses given, litigation settled, etc. Thus, this agreement is being entered into by all parties in good faith.

---

1. Defendant General Motors Corporation has not joined in Lumonics' motion.

2. However, the partners do not have the same relative interests in Creative Patents as their respective proportionate interests in the law firm.

Decisions regarding the institution of litigation, settlement, licenses, etc., will be based on the input and agreement of all parties."

Lerner, David succeeded to the law firm practice October 1, 1979 and has represented plaintiffs throughout this case. Lerner, David is reimbursed for all disbursements incurred by it and is paid on an hourly basis for legal services rendered in connection with the lawsuit. Lerner, David has no contingent interest in the outcome of the lawsuit. Though plaintiffs' affidavits are not specific on this point, this opinion assumes (an assumption most favorable to Lumonics' position) that the funds for such payments to Lerner, David are being provided by Creative Patents as part of the $300,000 obligation already referred to.

### Creative Patents' Status

Because Lumonics' alternative motions to dismiss the complaint and to join Creative Patents as a party plaintiff are both predicated on Creative Patents' claimed indispensability as such party, a decision on that issue will dispose of both alternatives. In that respect Lumonics argues that under the long-established principle of *Waterman v. Mackenzie*, 138 U.S. 252, 255, 11 S.Ct. 334, 34 L.Ed. 923 (1891), Creative Patents is an "assignee" of a part of the patent in suit, because it is allegedly the grantee of "an undivided part or share of [the] exclusive right [to make, use and vend the invention throughout the United States]." *Waterman* teaches that such an assignee has "a right to sue infringers . . . jointly with the assignor."

Plaintiffs contend however, that Creative Patents' rights, as stated in the 1976 Agreement that created such rights, are an "interest in all gross income derived from such rights and patents." That interest, they argue, is different from that of an assignee. Although they do not suggest the analogy, that distinction has its counterparts elsewhere in the law—for example, in the familiar distinction under partnership law between the assignee of a partnership interest, who succeeds to all the interests of a partner, and the assignee of a right to the income from the same interest, who is not given the partner's rights as such. See, e. g., Uniform Limited Partnership Act § 19; *Dixon v. American Industrial Leasing Co.*, 205 S.E.2d 4 (W.Va.1974).

■ But it is not necessary for this Court to decide that issue in a vacuum. At worst the 1976 Agreement is ambiguous on that score. Under those circumstances the intention and understanding of the parties to the Agreement must control. And in the present case *all* the contracting parties confirm that Creative Patents was *not* intended by the 1976 Agreement to have an ownership interest in Gould's patent itself (as distinguished from having the right to receive income from the patent): See Creative Patents' President Littenberg's affidavit ¶ 6; Gould's affidavit ¶ 3; Refac President Lang's affidavit ¶ 2.

It should be recognized that the principal focus of this question, as with any question regarding indispensable parties, is on any potential prejudice to the opposing party. Fed.R.Civ.P. 19(a) provides:

"A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest."

In this respect Creative Patents has acknowledged "that it does not have a right to sue for infringement of any of the Gould patents which are covered by the agreement" (Littenberg's affidavit ¶ 6). Thus whatever the outcome of the present litigation, Creative Patents would plainly be estopped from subjecting Lumonics to potential double or inconsistent obligations.

Plainly none of the branches of Rule 19 applies here to require Creative Patents' joinder as a party plaintiff.[3] Accordingly, Lumonics' alternative motions for dismissal or joinder are denied.

### Lerner, David's Disqualification

This Court commented more than three years ago[4] on the growing tendency to employ motions to disqualify as what the Court of Appeals for the Second Circuit has termed "common tools of the litigation process." *International Electronics Corp. v. Flanzer,* 527 F.2d 1288, 1289 (2d Cir. 1975). Since then the spate of disqualification motions has increased, and the movement (once primarily concentrated in the Second Circuit) has generated a substantial number of thoughtful federal appellate decisions in this Circuit and elsewhere.

We must not lose sight of the fact that the interest that lawyer disqualification seeks to protect is the avoidance of actual or possible prejudice to the moving party. Though the Code of Professional Responsibility has as its primary thrust the protection of the *public* interest, a private litigant is deemed entitled to invoke its provisions to the extent that lawyer activity in contravention of the Code—and therefore by definition against the public interest—impacts on the private litigant's own rights.

This is the reason that an expansive reading is often given to Canon 9 ("A lawyer should avoid even the appearance of professional impropriety") in the context of conflict of interest situations.[5] But this case involves no such situation. What Lumonics objects to does not impact on *it* in any manner comparable to an actual or possible conflict of interest (with a limited exception regarding the possible need for Lerner,

David testimony, discussed later in this opinion).

■ Although Lumonics makes what purports to be a conflict of interest argument, it is entirely misplaced. Cases like *Zylstra v. Safeway Stores, Inc.,* 578 F.2d 102 (5th Cir. 1978), disqualify lawyer class members from representing their class because of actual or potential conflicts between their individual rights and those of other class members. But DR 5–101(A), which states the policy mandating that result, expressly excepts the situation involved in the present case:

> "*Except with the consent of his client after full disclosure,* a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests." [Emphasis supplied]

As stated earlier, there is no question that this case involves the consent of *all* the law firm's clients, expressed in the most urgent and enthusiastic terms, as well as full disclosure.[6] Lumonics' argument on this score must be rejected out of hand.

Lumonics also seeks to complain of the fact that under the 1976 Agreement Creative Patents (which Lumonics equates with Lerner, David) is obligated to furnish legal services "including disbursements relating thereto" and that such agreement allegedly contravenes the Code. Even were that true, there is some question as to *Lumonics'* right to enforce the Code by disqualifying the law firm, as distinct from the right of the appropriate disciplinary authorities to institute proceedings against the allegedly offending lawyers. But even assuming

---

3. Creative Patents has expressed its willingness to join as a plaintiff. Its main thrust is that it would not want any such joinder to prejudice the determination of the disqualification issue, next discussed in this opinion.

4. Shadur, Lawyers' Conflicts of Interest: An Overview, 58 Chi.B.Rec. 190 (1977).

5. There is to be sure a danger in employing Canon 9 with too broad a brush. See Shadur,

op. cit. supra note 4 at 194, and cases there cited.

6. In the class action cases, where by definition the members are so numerous that it is impracticable to join them as plaintiffs (Fed.R.Civ.P. 23), consent is inherently impossible to obtain. Full disclosure to all class members is also extremely unlikely. Hence DR 5–101(A) mandates the *Zylstra*-type decisions.

arguendo the therapeutic value of permitting private litigants to do so, there are at least two answers that reject Lumonics' argument on the merits.

First, Creative Patents and Lerner, David are not in fact the same entities. If there were only a paper distinction between the two, this Court would of course regard that as a distinction without a difference. Here however the differences are material. Patlex has in good faith invested over $1 million in the acquisition of stock in Creative Patents. Moreover, even looking at the lawyers involved, their respective shareholder interests in Creative Patents are in percentages different from their participations as partners in the law firm. These are more than cosmetic distinctions, and they justify the conclusion that the obligation of Creative Patents to provide funds for litigation disbursements is *not* to be ascribed to Lerner, David. As already stated, Lerner, David does not carry either disbursements or legal fees; it is paid on a current basis for both.

Second, even if that were not the case, we are concerned here with the validity of a *contract* entered into by New Jersey lawyers relating to their furnishing of legal services and funding of disbursements. Under such circumstances the normal choice of law doctrine would look to New Jersey law to determine the validity of that contract. New Jersey has deliberately deleted the provision of ABA Code DR 5–103(B) on which Lumonics seeks to rely for claimed invalidity (deleted language indicated by brackets): [7]

"While representing a client in connection with contemplated or pending litigation, a lawyer shall not advance or guarantee financial assistance to his client, except that a lawyer may advance or guarantee the expense of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence [providing the client remains ultimately liable for such expenses]."

To be sure, this Court's General Rule 8D permits the disciplining of lawyers who fail "to abide by the provisions of the Canons of Ethics [sic] of the American Bar Association." But the ABA version of the Code does not itself have the force of law; It is recommendatory only. Every jurisdiction is free to and does adopt its own version of the Code. Indeed, Illinois has just now done so for the first time. Illinois' Code, predicated in principal part on the report and recommendations of the Stanley Committee (and in part on those from the Chicago Bar Association Task Force of which this Court was a member), contains major departures from the ABA version. It would create an intolerable situation if an Illinois lawyer, whose continuing right to practice law depends upon his adherence to the Illinois version of the Code, could by such adherence jeopardize his right to practice in this Court because of differences between that Code and the ABA version.

■ That principle applies with equal force to this case. Because the 1976 Agreement was valid under New Jersey law,[8] it should not cause the lawyers who entered into it, and are complying with it, to be disqualified in this case. Lumonics' argument on this ground thus does not withstand analysis either.

---

7. New Jersey amended DR 5–103(B) on September 10, 1973, some three years prior to the agreement here in question. The Honorable Sylvia B. Pressler, Judge of the Appellate Division of the Superior Court of New Jersey, stated in explaining the revised rule:
"The change was apparently motivated by the universal practice by which an attorney, who represents a client on a contingent-fee basis, declines to sue his client for reimbursement of advanced expenses or to take any other action to collect the litigation expenses from his client where there has been no recovery. The effect of the Rule change, therefore, is to insure that the prevailing practice of the Bar will not constitute an ethical violation." Rules Governing the Court of the State of New Jersey, Pressler Comments and Annotations, p. 112 (Gann Law Books, 1980 ed.)

8. This Court does not view the New Jersey version of the Code, which permits lawyers to provide litigation costs, as so offensive to public morals—as a kind of *malum in se*—as to make it unenforceable or to justify its being ignored.

Lumonics' related argument, in which it claims that the 1976 Agreement gives Lerner, David a right to veto possible compromises of the litigation and is therefore against public policy (as reflected in Canon 7 of the Code), is equally without merit. That may be a conceivable reading of the 1976 Agreement, but it is clearly not one that has been adopted by the parties to the Agreement—and this Court will certainly not force it on them. Moreover the informed *consent* of the clients to the arrangement, just as with the DR 5–101(A) argument, should provide a complete answer: Lumonics can scarcely confer on itself the right to override the intention of the contracting parties. Finally and conclusively, there is the important distinction between Lerner, David and Creative Patents already discussed; and it is the latter, and not the former, that has the right to participate in the decisions regarding the conduct of the litigation.

Lumonics' next argument, based on the possible need of Lerner, David members to testify in this suit, is refuted by the specific provisions of the Code on which Lumonics must rely for that argument. DR 5–102(A) clearly does not apply, because plaintiffs assert (and the Court has no reason to doubt that assertion at this preliminary stage of the litigation) that it is not "obvious that [any of the lawyers] ought to be called as a witness on behalf of his client." On the other hand, if *Lumonics* chooses to call any of the lawyers as a witness, DR 5–102(B) requires disqualification of that lawyer (and his law firm) only if "it is apparent that his testimony is or may be prejudicial *to his client*"—a situation clearly not involved here.

Finally, Lumonics' contentions based on Canon 9 deserve equally short shrift. As already indicated, there is some question whether that Canon should provide an independent source of discipline or disqualification. This Court has found no *actual* impropriety requiring disqualification. And even if Canon 9's "appearance of impropriety" establishes a separate substantive test, this Court will not apply the standard in the manner urged by Lumonics: a kind of gen-eralized innuendo based on a disposed–of SEC complaint against the law firm, not having a direct relationship to this litigation.

*Conclusion*

As stated at the outset of this opinion, Lumonics' motions are denied in their entirety:

1. Creative Patents will not be ordered to join as a party plaintiff, though it may elect to do so.
2. Lerner, David's right to remain as counsel for plaintiffs is confirmed.